Ruth L. McLAUGHLIN, Thomas W. McLaughlin, Plaintiffs,

v.

CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Does I through X, inclusive, Defendants.

No. C–81–4367–MHP.

United States District Court, N.D. California.

May 3, 1983.

Craig G. McIntosh, Katz & McIntosh, Inc., San Francisco, Cal., for plaintiffs.

Bradley A. Levin, Law Offices of Guy O. Kornblum, San Francisco, Cal., for defendants.

## ORDER

PATEL, District Judge.

### I.

This action arises out of defendant Connecticut General Life Insurance's ("Connecticut General") denial of Ruth and Thomas McLaughlin's claim for expenses incurred at the Immunology Researching

Centre. Plaintiffs [1] allege three separate causes of action: breach of the insurance contract, breach of the implied covenant of good faith and fair dealing, and breach of California Insurance Code § 790.03(h).[2] The parties filed cross-motions for summary judgment. Having carefully considered the papers submitted and the arguments of counsel, the court hereby grants summary judgment for plaintiffs on the contract and implied covenant causes, and summary judgment for defendant on plaintiffs' punitive damages claim.

Summary judgment is only appropriate if there is no genuine dispute of fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court must view the evidence in the light most favorable to the non-moving party. Therefore, for purposes of plaintiffs' motion, the court must consider the following facts as established.

Thomas McLaughlin is an employee of Trans World Airways ("TWA"). Pursuant to a collective bargaining agreement between TWA and Mr. McLaughlin's union, Connecticut General provides TWA employees with an employee benefit plan, which includes a group health insurance policy. Under the policy, Mr. McLaughlin is insured as an employee, and Mrs. McLaughlin is insured as his "dependent." The policy provides coverage for medical expenses "only to the extent that the services or supplies provided are recommended by a physician and are essential for the necessary care and treatment of the ... sickness." The policy excludes coverage "for charges for unnecessary care or treatment." The policy makes no mention of the effect on coverage or exclusion of the Food and Drug Administration's ("FDA") approval of drugs or treatments. The policy does provide for coverage of medical expenses incurred in foreign jurisdictions.

In June, 1980, Mrs. McLaughlin's doctors diagnosed her as having terminal lung cancer. Although her doctors recommended that she undergo chemotherapy, she rejected their advice and instead in July, 1980 went to the Immunology Researching Centre in the Bahamas. There she underwent immuno-augmentative therapy which is an experimental cancer therapy not approved by the FDA for use in the United States. Mrs. McLaughlin remained in the Bahamas until October 1980 and then returned to California where she continued the immuno-augmentative treatments until her death in October 1982.

In late 1980, plaintiffs began submitting claims to defendant for expenses incurred at the Immunology Researching Centre. Responding to defendant's request for itemized billings, on November 1, 1980, Mrs. McLaughlin wrote defendant stating, *inter alia*, that she had visited her original oncologist, Dr. Schoen, and that he was "impressed" by her condition. After considering her claims, defendant's San Diego office referred her file to defendant's home office in Hartford. There, Helen Daffron, a medical claims examiner, considered and denied her claims. Plaintiffs were notified by letter dated February 9, 1981. On March 6, 1981, plaintiffs requested ERISA[3] review of the denial and the claims were therefore again referred to the Hartford office. After receiving both a medical and legal report, Albert Perreault, the official charged with making final claims decisions, denied plaintiffs' claims.

On June 26, 1981, Mrs. McLaughlin's doctor at the Stanford University Medical Center, Dr. Charlotte Jacobs, wrote defendant on plaintiffs' behalf. She stated,

> [t]he patient chose to be treated with immunotherapy under Laurence Burton

---

1. Mrs. McLaughlin recently passed away and her estate has substituted in as plaintiff. The only effect this has on the present lawsuit is that Mrs. McLaughlin's emotional distress claims have lapsed.

2. Because of the court's resolution of the breach of contract and implied covenant

claims, it has not ruled on plaintiffs' § 790.-03(h) claims and discusses them no further in this order.

3. Employee Retirement and Income Security Act, 29 U.S.C. §§ 1001–1381.

of the Immunology Researching Centre. I did not know any details of the treatment that she received there. The average survivial of a patient with metastatic oat cell carcinoma is approximately 9 to 11 months. Mrs. McLaughlin will certainly have a much longer survival and she is relatively symptom free. Although she received unconventional treatment for her disease she may have benefitted from it.

After receiving defendant's final denial, plaintiffs requested reconsideration and clarification of the defendant's grounds. Perreault denied their reconsideration request by letter on August 18.

The sole basis for defendant's denial was that immuno-augmentative therapy is not FDA-approved. This is indisputable in light of Helen Daffron's and Albert Perreault's deposition testimony. Daffron, the first of defendant's agents to deny the claim, testified as follows:

Q. Did you equate non-FDA approval to not necessary to the care and treatment of this patient?
A. Yes.

. . . . .

Q. And we agreed, I thought we agreed, that the policy provision that you were denying this under was not necessary for her care and treatment, right?
A. Correct.
Q. And you base that decision on the fact that it was, at least to your knowledge, non-FDA approved treatment, correct?
A. Correct.
Q. You know nothing else about whether this treatment was necessary to this woman's health, outside of the fact it was non-FDA approved, right, when you denied that claim, right?
A. Correct.
Q. Would it still be your position that even if two of her physicians in the United States said that Ruth McLaughlin benefitted from this treatment that you would still deny the claim because it was non-FDA approved?

A. Correct.

. . . . .

Q. Even if medical evidence showed, through doctors in the United States, that Ruth McLaughlin benefitted from the treatment she received, you would still not pay the claim because it's non-FDA approved, right?
A. Right.

Perreault made the final decision to deny plaintiffs' claims. His testimony is equally unequivocal that the sole basis for denial was non-FDA approval:

Q. My question to you is is it irrelevant to you, in making your decision in denying this claim, whether or not two physicians licensed to practice in California believe and have communicated to Connecticut General that the treatment that she received for which she is making a claim benefitted her?

. . . . .

A. The answer is no.

. . . . .

A. So the whole issue as to whether or not this treatment . . . was of a medical benefit to her or not did not enter into your denial of her claim, is that correct?
A. That's correct.
Q. So then I take it that you denied her claim solely on the basis that the treatment was not FDA-approved, is that correct?
A. That's correct.
Q. And this is the only basis?
A. That is correct.

. . . . .

Q. And it had nothing to do with any other provisions of the group policy issued at TWA, right? . . . when you made the denial, right?
A. Right.

. . . . .

Q. Are you telling me that all you have to do is have a non-approval by the FDA and that equates with not necessary care and treatment of an illness?
A. Essentially, yes.

Not only was non-FDA approval the sole basis for denial, defendant also communicated this to the plaintiffs. There was a series of correspondences between the parties in which defendant's agents merely stated that the claim was denied as not essential to the necessary care or treatment of an illness. However, when the plaintiffs requested clarification of the basis for the ERISA denial, Perreault in his August 18 final denial responded:

I have discussed your request for reconsideration of the decision to exclude the expense of treatment at the Immunology Researching Center with members of our Medical and Legal departments. I am advised that since our denial is limited to the immuno-augmentative cancer therapy which is not approved by the Food and Drug Administration or available in the United States as a prescription required service that the exclusion of the expenses of therapy is appropriate.

Furthermore, defendant's investigation into possible bases for Mrs. McLaughlin's claims was negligible. Despite the fact that Mrs. McLaughlin had represented to defendant that Dr. Schoen was impressed with her condition following the immuno-augmentative treatments, and later Dr. Jacobs wrote defendants that the therapy may have benefitted Mrs. McLaughlin, none of defendant's agents contacted either of these doctors to ask their opinion about whether the therapy was effective for Mrs. McLaughlin. Nor did they contact the Immunology Researching Center or any other doctor who believes that the therapy may be effective. They never requested her medical records. Helen Daffron testified,

Q. You talked to no one else, got no other input and you just did it on whatever you had there, right?

A. Right.

Q. And I take it you made no inquiry from anybody, Patty Dolat or anybody else, as to what this woman's doctors in the United States thought of this treatment, right?

A. Right.

Albert Perreault also failed to investigate the claim. He admitted that the defendant had paid claims for Laetrile in some cases despite the fact that Laetrile was not FDA-approved. The company paid, he stated, if "the law of the state says that this drug may be obtained only upon the prescription of a physician." However, when asked whether immuno-augmentative therapy was available only upon prescription in the Bahamas, he answered,

A. I don't know that.

Q. And you made no effort to find that out, right?

A. That's correct.

Perreault further testified,

Q. After you got the letter from Dr. Jacobs and read it, did you do anything whatsoever to follow up on that letter to ascertain whether or not in the opinion of any doctors who ever saw Ruth McLaughlin that this treatment benefitted this lady?

A. No.

. . . . .

Q. My question to you is did anyone in Connecticut General, either in San Diego or any place else, attempt to contact Dr. Schoen to find out his opinion as to whether or not this treatment benefitted Ruth McLaughlin?

A. To the best of my knowledge, no.

. . . . .

Q. Are you telling me that all you have to do is have a non-approval by the FDA and that equates with not necessary care and treatment of an illness?

A. Essentially, yes.

Q. No further examination has to be made? Or let's put it this way. No further examination is made.

A. No further examination is made.

The only investigation done at all was by Dr. Carr, the medical adviser to Perreault. He read a few articles about the Burton therapy and made a phone call to another doctor to discuss it. However, he did not contact Mrs. McLaughlin's United States doctors, the Immunology Researching Centre, or any doctor who supports the therapy.

He could not even recall definitely whether he had looked at her file before advising Perreault.

Finally, in addition to failing to investigate, Perreault was aware that his interpretation of the policy was at least debatable. In a legal memorandum to Perreault, dated May 5, 1981, defendant's attorney Mike Ryback observed that he thought that FDA approval was the crucial consideration, but noted,

> [t]he fact that our group medical contract does not contain a specific exclusion for non-FDA approved prescriptions could prove troublesome.

Ryback based this conclusion on the court's language in *Wilson v. Travelers Ins. Co.,* 605 P.2d 1327 (Okl.1980), which suggests that if an insurance company does not want to pay for non-FDA approved drugs it should so state in its policy.

## II.

### *Subject Matter Jurisdiction*

■ Lack of subject matter jurisdiction cannot be waived by the parties. Consequently, though neither party has raised this question, the court must do so *sua sponte.* Originally, plaintiffs brought this case in state court; defendant then removed it to federal court alleging that this court has diversity jurisdiction over the action. Though it is undisputed that plaintiffs and Connecticut General are diverse for ordinary purposes, the parties failed to consider the "direct action" exception to 28 U.S.C. § 1332(c). § 1332 provides:

> (c) For the purposes of this section and section 1441 of this title, a corporation shall be deemed a citizen of any State by which it has been incorporated and of the State where it has its principal place of business: *Provided further* that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been in-

corporated and of the State where it has its principal place of business.

Though interpretations of this section have been conflicting, at least some courts have held that the section applies regardless of whether the action based on a policy of insurance sounds in tort or contract. *See, e.g., Tyson v. Connecticut General Life Ins. Co.,* 495 F.Supp. 240 (E.D.Mich.1980), and cases cited therein. In *Tyson,* the court held that when an employee sues under a group insurance policy provided by the employer, the defendant insurance company's citizenship for diversity purposes includes not only its place of incorporation and principal place of business but also that of the employer. In the instant action, plaintiffs are citizens of California and Connecticut General is a citizen of Connecticut. However, the court does not know the citizenship of TWA, plaintiff's employer. Accordingly, without stating any opinion as to whether this court would adopt the *Tyson* court's analysis, the court directs the parties to submit affidavits regarding TWA's citizenship. If, as the court anticipates, TWA is not a citizen of California, the court will avoid ruling on the difficult question of interpretation raised by § 1332(c).

## III.

### *Interpretation of the Policy*

At issue in this case is the proper interpretation of the coverage and exclusion clauses of defendant's policy. More specifically, the question is whether Mrs. McLaughlin's immuno-augmentative treatments were "essential to the necessary care and treatment" of her cancer or, conversely, whether they were "unnecessary care or treatment."

■ California has well settled rules for the interpretation of insurance contracts. First, ambiguities are construed against the insurance company. Thus, coverage clauses are interpreted broadly in favor of coverage, while exclusions are interpreted narrowly. *See State Farm Mutual Automobile Ins. Co. v. Partridge,* 10 Cal.3d 94, 101–02, 109 Cal.Rptr. 811, 514 P.2d 123

(1973). Moreover, if two or more interpretations are reasonable, the court must adopt the interpretation which favors coverage. "If semantically permissible, an insurance contract will be given such interpretation as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates." *State Farm Mutual Automobile Ins. Co. v. Jacober,* 10 Cal.3d 193, 203, 110 Cal.Rptr. 1, 514 P.2d 953 (1973) (*quoting Continental Cas. Co. v. Phoenix Constr. Co.,* 46 Cal.2d 423, 437, 296 P.2d 801 (1956)). In other words, the insurer must establish that its interpretation supporting denial is the only reasonable construction of the contract. *See Steven v. Fidelity & Casualty Co.,* 58 Cal.2d 862, 875, 27 Cal.Rptr. 172, 377 P.2d 284 (1962). Finally, the insurance contract must be considered in light of the insured's reasonable expectations of coverage, and notice of noncoverage in a situation where coverage may be reasonably expected must be conspicuous, plain, and clear. *See Gyler v. Mission Ins. Co.,* 10 Cal.3d 216, 220, 110 Cal.Rptr. 139, 514 P.2d 1219 (1973).

Defendant argues that these rules of construction are inapplicable to this case for a variety of reasons. It contends that federal law preempts these state law rules of construction, that the policy is not an adhesion contract under state law, that the contract must be interpreted in accordance with public policy, and that the policy language is unambiguous. The court will consider each argument separately.

### A.

### *Federal Preemption*

Defendant argues that federal law preempts plaintiffs' state law claims and, consequently, that state law principles governing the interpretation of insurance contracts are inapplicable to this case. Citing *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir. 1976), defendant contends that those state standards are inconsistent with federal labor policy. Though defendant has hardly elucidated the difficult legal principles involved, its claim raises novel and complex questions about the interaction between

*Rehmar,* section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, and ERISA's preemption provisions, 29 U.S.C. § 1144. In order to explain the resolution of this question, it is necessary to undertake a somewhat extended discussion of the preemption question.

■ It is indisputable that where the insurance company makes final claims decisions under a group insurance policy issued to an employee benefit plan, ERISA governs the relationship between the insurance company and the insured. 29 U.S.C. § 1003(a) provides that ERISA shall apply to any "employee benefit plan" established or maintained by an employer or employee organization. § 1001(1) defines "employee welfare benefit plan," a type of employee benefit plan under § 1001(3), to include,

> any plan, fund, or program, which ... was established or is maintained for the purpose of providing for its participants or their beneficiaries, *through the purchase of insurance or otherwise,* (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness... (emphasis supplied).

Since TWA provides its employees with an employee welfare benefit plan through the purchase of insurance, ERISA clearly covers the plan in this case.

■ Equally clearly, Connecticut General is an ERISA fiduciary for the plan. § 1002(21)(A) defines an ERISA fiduciary:

> [A] person is a fiduciary with respect to a plan to the extent ... (iii) he has any discretionary authority or discretionary responsibilities in the administration of such plan.

Under the TWA plan, Connecticut General has the authority to grant or deny claims. Consequently, it has discretionary authority in the administration of the plan and is a fiduciary. The Department of Labor's regulations explicitly adopt this interpretation of § 1002(21)(A):

> To the extent that benefits under an employee benefit plan are provided or administered by an insurance company, insurance service, or other similar organiza-

tion which is subject to regulation under the insurance laws of one or more States, the claims procedure pertaining to such benefits may provide procedure for review of and decision upon denied claims by such company, service, or organization. In such case, that company, service, or organization shall be the "appropriate named fiduciary" for purposes of this section.

29 C.F.R. § 2560.503–1(g)(2) (1982). *See also* the Department's explanation for the foregoing interpretation. 42 Fed.Reg. 27426, 27427 (May 27, 1977). *Accord Eversole v. Metropolitan Life Ins. Co., Inc.,* 500 F.Supp. 1162, 1164–66 (C.D.Cal.1980); *LeFebre v. Westinghouse Electric Corp.,* 549 F.Supp. 1021, 1026 (D.Md.1982); *Austin v. General American Life Ins. Co.,* 498 F.Supp. 844, 846 (N.D.Ala.1980); *but see Lederman v. Pacific Mutual Life Ins. Co.,* 494 F.Supp. 1020, 1022 (C.D.Cal.1980); *Cate v. Blue Cross & Blue Shield of Alabama,* 434 F.Supp. 1187, 1190–91 (E.D.Tenn.1977).[4] Accordingly, since ERISA applies to the present dispute and plaintiffs could have sought relief under 29 U.S.C. § 1132,[5] which provides a federal civil action for wrongful denial of benefits, the court must determine whether ERISA preempts plaintiffs' state law claims.

ERISA's complex preemption provisions provide, in relevant part, as follows:

§ 1144(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975.

(b) . . .

(2)(A) Except as provided in subparagraph (B), nothing in this subchapter shall be construed to exempt or relieve any person from any law of any State which regulates insurance, banking, or securities.

(B) Neither an employee benefit plan described in section 1003(a) of this title, which is not exempt under section 1003(b) of this title (other than a plan established primarily for the purpose of providing death benefits), nor any trust established under such a plan, shall be deemed to be

---

**4.** The court finds the rationale of *Cate v. Blue Cross & Blue Shield of Alabama,* 434 F.Supp. 1187 (E.D.Tenn.1977), adopted in *Lederman v. Pacific Mutual Life Ins. Co.,* 494 F.Supp. 1020 (C.D.Cal.1980), untenable in light of the Labor Department's regulations, 29 C.F.R. § 2650.-503–1(g)(2), and the plain language of ERISA. In *Cate,* the court reasoned that in enacting ERISA Congress was concerned primarily with the establishment, operation and administration of benefit plans and with assuring their financial soundness and that it showed no concern that state laws regulating insurance companies are inadequate to achieve these purposes. The court concluded, therefore, that despite the literal language of 29 U.S.C. § 1132, providing a civil action for wrongful denial of benefits, Congress did not intend to create federal jurisdiction over every suit by a dissatisfied claimant under a group insurance policy purchased by the plaintiff's employer. However, the court failed to consider either § 2560.-503–1(g)(2) or 29 U.S.C. § 1002(21). In the more recent case, *Austin v. General American Life Ins. Co.,* 498 F.Supp. 844 (N.D.Ala.1980), the court considered the regulation and attempted to reconcile it with *Cate* and *Lederman.* It noted its agreement with *Cate* that

where the insurers' only relationship to an ERISA plan is to provide contractual benefits, § 1132 does not create federal jurisdiction. However, as provided in § 2560.503–1(g)(2), where the plan grants the insurer the responsibility for reviewing denied claims, the insurer is an ERISA fiduciary.

This court concurs in the *Austin* court's analysis. Providing coverage to an ERISA plan does not alone make an insurance company a fiduciary under § 1002(21). However, where, as here, the plan provides the insurer with the discretionary responsibility of making final claims decisions, the insurer is a fiduciary under the Act. To the extent that *Cate* and *Lederman* are inconsistent with this conclusion, the court rejects their analysis.

**5.** 29 U.S.C. § 1132(a)(1)(B) provides in relevant part:

(a) A civil action may be brought—
(1) by a participant or beneficiary—

. . . . .

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

an insurance company or other insurer, bank, trust company, or investment company or to be engaged in the business of insurance or banking for purposes of any law of any State purporting to regulate insurance companies, insurance contracts, banks, trust companies, or investment companies.

In the *Eversole* case, plaintiff brought state law actions against her insurer based on a group insurance policy provided by her employer. In a persuasive opinion, Judge Pfaelzer thoroughly analyzed these preemption provisions and concluded that § 1144(b)(2)(A) exempted plaintiff's state law claims from preemption. The court adopts Judge Pfaelzer's analysis here. *See also Wadsworth v. Whaland,* 562 F.2d 70, 76–8 (1st Cir.1977), *cert. denied,* 435 U.S. 980, 98 S.Ct. 1630, 56 L.Ed.2d 72 (1978).

■ § 1144(a)'s broad preemption provision clearly applies to plaintiffs' claims. They seek a state law determination of whether Mrs. McLaughlin is entitled to reimbursement under the plan and the damages recoverable for a wrongful denial. Since § 1144(a) applies to both decisional and statutory law, § 1144(c)(1), the state law claims "relate" to the employee benefit plan. Consequently, unless exempted by § 1144(b)(2)(A)'s savings clause, plaintiffs' claims are preempted.

§ 1144(b)(2)(A) saves from preemption state laws which "regulate insurance." Nothing in the legislative history or the Act defines the scope of this broad language. However, the Supreme Court has authoritatively construed almost identical language in the McCarran-Ferguson Act, 15 U.S.C. § 1011–1015. § 1012(b) of the McCarran-Ferguson Act provides:

[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance.

In *SEC v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court interpreted the scope of the phrase "regulating the business of insurance:"

Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* [8 Wall. 168, 19 L.Ed. 357] held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they to (sic) must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly are laws regulating the "business of insurance."

*SEC v. National Securities,* 393 U.S. at 460, 89 S.Ct. at 568–69. Under this construction, it is apparent that the state rules for construing insurance contracts upon which plaintiffs rely and the implied covenant of good faith and fair dealing are state laws which "regulate insurance," and are therefore exempt from preemption.

This conclusion is further strengthened by § 1144(b)(2)(B), the so-called "deemer" clause. That subsection prohibits a state from deeming an employee benefit plan to be an insurance company for the purpose of any state law regulating insurance. This prevents states from regulating self-insured employee benefit plans as if they were insurance companies. However, the "deemer" clause would only be necessary if Congress assumed that the savings clause exempted state regulation of insurance companies. Conversely, if the deemer clause were interpreted more broadly to bar state regulation of insurance policies issued to employee benefit plans, it would nullify the savings clause. The savings clause would save nothing because § 1144(a) only preempts state insurance laws which "relate" to employee benefit plans, and the deemer clause would in effect preempt

these. *See Eversole,* 500 F.Supp. at 1169, and *Wadsworth,* 562 F.2d at 78. Accordingly, the court concludes that at least when the plan is not created pursuant to collective bargaining, ERISA does not preempt state law claims for breach of contract and implied duties of good faith and fair dealing.

However, when the plan is created pursuant to a collective bargaining agreement, as in the instant case, the preemption analysis takes on a new dimension. The question then becomes whether federal labor law and policy require a different result. The analysis of this question begins with the Ninth Circuit's decision in *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir.1976). In *Rehmar,* a case arising just prior to the effective date of ERISA, the trustees of a pension plan had denied plaintiff survivor's benefits under a collectively-bargained pension plan. Plaintiff sued in state court, and the trustees removed. Applying principles derived from state insurance law, such as, *inter alia,* that ambiguities should be construed against the insurer, the district court found for the plaintiff. The Ninth Circuit reversed. First, it considered whether the district court had jurisdiction under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, over a suit to recover pension benefits allegedly due under a collectively bargained pension plan. § 301 provides:

> [s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court without respect to amount in controversy or without respect to the citizenship of the parties.

Construing this section to require only that a suit be for violation of a contract between a union and an employer, the court held that § 301 jurisdiction exists regardless of whether either the union or the employer is a party to the suit.

Having concluded that the district court had jurisdiction under § 301, the court then determined, citing *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), that federal common law controlled in cases seeking pension benefits allegedly due under a collectively-bargained pension plan. In *Lincoln Mills,* the Supreme Court held that § 301 not only created federal jurisdiction, but also directed the federal courts to create a federal common law based on federal labor policy to control disputes over the terms of collective bargaining agreements. The court further held that federal law exclusively controlled such disputes, thereby, in effect, finding that § 301 preempts all state law actions for violation of collective bargaining agreements:

> [f]ederal interpretation of the federal law will govern, not state law (citations). But state law, if compatible with the purpose of § 301, may be resorted to in order to find the rule that will best effectuate the federal policy (citation). Any state law applied, however, will be absorbed as federal law and will not be an independent source of private rights.

*Lincoln Mills,* 353 U.S. at 457, 77 S.Ct. at 918.

Applying *Lincoln Mills,* the *Rehmar* court reasoned that though the district court could look to state law for guidance, it could adopt that law only if consistent with federal labor policy. Because the state rules relied on by the district court derived from adhesion contract principles, the court held that they were inapplicable as inconsistent with federal policy. Federal labor policy, the court reasoned, presumes that the parties are of equal bargaining strength. *Rehmar,* 555 F.2d at 1368–69. The court then concluded that a court may overturn the trustees' decision only if it is arbitrary or capricious. Subsequent Ninth Circuit cases, decided after the effective date of ERISA, reaffirm the continued vitality of *Rehmar* and § 301 as an alternative jurisdictional basis to § 1132. *See Gordon v. ILWU—PMA Ben. Funds,* 616 F.2d 433, 437–39 (9th Cir.1980); *Smith v. CMTA–IAM Pension Trust,* 654 F.2d 650, 654–55 (9th Cir.1981); and *Elser v. I.A.M. Nat. Pension Fund,* 684 F.2d 648, 653 (9th Cir.1982). These cases also hold that § 301's arbitrary or capricious standard of

review applies in ERISA actions under § 1132 as well. *See Gordon,* 616 F.2d at 438.[6]

■ Since *Rehmar* holds that suits to recover benefits allegedly due under a collectively-bargained pension plan are suits under § 301 and *Lincoln Mills* holds that § 301 preempts state law actions for violation of collective bargaining agreements, taken together those cases can be read for the proposition that § 301 preempts plaintiffs' state law claims here. However, this court declines to so read them. It is well settled that preemption is ultimately a question of Congressional intent. *Malone v. White Motor Corp.,* 435 U.S. 497, 504, 98 S.Ct. 1185, 1189, 55 L.Ed.2d 443 (1978); *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 222, 11 L.Ed.2d 179 (1963). ERISA is an enormously complex and comprehensive regulation of employee welfare and pension plans. Both § 301 *Rehmar* actions and § 1132 ERISA actions to recover benefits serve the same Congressional purpose: to provide uniform federal regulation of disputes over the terms of employee benefit plans. This similarity is reflected in the fact that the standard of review of trustees' decisions is identical in § 301 and § 1132 actions. Consequently, they are *in pari materia* and should be construed consistently. Unless Congress intended to except from ERISA's savings clause plans which emerge from collective bargaining, neither ERISA nor § 301 preempt plaintiffs' state claims. For a variety of reasons, the court concludes that Congress had no such intent.

■ First, neither § 1144(b)(2)(A) nor the legislative history of ERISA's preemption provisions distinguish between collectively-bargained and other plans with regard to preemption of state law. It is inconceivable that the Congress which enacted ERISA was unaware that many employee benefit plans are established through collective bargaining. *See Malone v. White Motor Corp.,* 435 U.S. at 507, 98 S.Ct. at 1191 ("There is also no doubt that the Congress which adopted the Disclosure Act recognized that it was legislating with respect to pension funds many of which had been established by collective bargaining."). Consequently, this failure to distinguish between these plans is highly probative of an intent not to distinguish. Moreover, the legislative history itself demonstrates that the Congress was acting with previously-enacted federal labor law firmly in mind. The House Conference Report states:

> with respect to suits to enforce benefit rights under the plan ... they may be brought not only in U.S. district courts but also in State courts of competent jurisdiction. All such actions in Federal or State courts are to be regarded as arising under the laws of the United States *in similar fashion to those brought under section 301 of the Labor Management Relations Act of 1947.*

H.R.Conf.Rep. No. 93–1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 5107 (emphasis supplied). *See Amato v. Bernard,* 618 F.2d 559, 567 (9th Cir.1980) and *Reiherzer v. Shannon,* 581 F.2d 1266, 1271 (7th Cir.1978).

In *Malone v. White Motor,* the Supreme Court faced a similar problem. Prior to the enactment of ERISA, Minnesota had passed an Act establishing minimum standards for the funding and vesting of employee pension plans. Plaintiffs sought a declaratory judgment that, *inter alia,* the federal labor laws preempted the Minnesota Act insofar as they purported to regulate collectively-bargained plans.[7] Departing from the usual rule that federal labor law preempts state attempts to regulate collective bar-

---

**6.** In *Gordon v. ILWU–PMA Ben. Funds,* 616 F.2d 433, 438 (9th Cir.1980), the Ninth Circuit stated:

we find that the applicability of ERISA to this case is unconsequential, because the actions of the trustees would be subject to the same standards of judicial review under ERISA's fiduciary provisions as they are under the Labor Management Relations Act and *Rehmar v. Smith.*

**7.** The Minnesota Act was clearly preempted by ERISA. *See Malone v. White Motor Corp.,* 435 U.S. 497, 499, 98 S.Ct. 1185, 1187, 55 L.Ed.2d 443 (1978).

gaining agreements, *see Alessi ·v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 526 n. 23, 101 S.Ct. 1895, 1907–08 n. 23, 68 L.Ed.2d 402 (1981), the court found that § 10 of the Welfare and Pension Plans Disclosure Act, 29 U.S.C. § 311, the predecessor to ERISA, expressed an intent to leave regulation of pension plans to the states. In response to plaintiffs' argument that a different rule should obtain for collectively-bargained plans because of the federal labor policy implications, the court noted that Congress was doubtless aware that many pension plans covered by the Disclosure Act were collectively-bargained. The court then observed:

> [y]et neither the bill as enacted nor its legislative history drew a distinction between collectively bargained and all other plans, either with regard to the disclosure role of the federal legislation or the regulatory functions that would remain with the States.

*Malone,* 435 U.S. at 508–09, 98 S.Ct. at 1191–92. In light of Congress' contrary intent in § 10, the court concluded, federal labor law did not preempt the Minnesota Act.

The *Malone* analysis applies with full force here. As previously noted, § 1144(b)(2)(A) and its legislative history draw no distinction between collectively-bargained and all other plans. Moreover, in the present case, there are even more compelling reasons to except state laws from preemption. On the *Malone* facts, though the court declined to so conclude, arguably the silence of § 10's legislative history on the effect of federal labor law suggested that Congress intended to leave the labor law's preemptive effect intact. In contrast, in the instant case, drawing such an inference from Congressional silence on the relationship between ERISA's preemption provisions and federal labor law would be entirely unjustified. Congress enacted ERISA in 1974. Prior to that time, only a few courts, if any, had found that § 301 provides a jurisdictional basis for actions seeking recovery of benefits due under a collectively-bargained benefit plan.[8] Thus, the Congressional silence is best explained by the inference that Congress was unaware that the labor laws would apply at all. Accordingly, its failure to distinguish between collectively-bargained and other plans indicates an intent that federal law not preempt state laws regulating insurance which relate to any employee benefit plan.

Two further considerations strengthen this conclusion. First, to hold otherwise would substantially weaken ERISA's savings clause since, as noted before, many employee benefit plans emerge from collective bargaining. The court should avoid such an interpretation if possible. Second, the McCarran-Ferguson Act's policy of state primacy over the regulation of insurance strongly supports the court's conclusion. *See SEC v. National Securities,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). § 1144 of ERISA twice reaffirms this national policy: first in the insurance savings clause and then in subsection (d) which provides that ERISA shall not "be construed to alter, modify, invalidate, impair, or supersede any laws of the United States." *See Wadsworth v. Whaland,* 562 F.2d at 78, and *Eversole v. Metropolitan Life,* 500 F.Supp. at 1168. Without a clear statement of intent, this court should not interpret ERISA or the federal labor laws to bar state regulation of all group insurance policies purchased by collectively-bargained employee benefit plans. *See Wadsworth v. Whaland,* 562 F.2d at 78. Such an interpretation would substantially restrict the States' authority to regulate insurance.

Finally, the *Rehmar* court's concern that state rules for construing insurance contracts are inconsistent with federal labor policy does not apply to the question before this court. In *Rehmar,* the court stated that federal labor law presumes that employers and unions are of equal bargaining strength. Consequently, since California insurance contract rules are based on adhe-

---

**8.** The Ninth Circuit decided *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir.1977) on October 15, 1976 and then amended its opinion on Denial of Rehearing on January 3, 1977.

sion contract principles, the court reasoned, they are inconsistent with federal labor policy. However, federal labor policy does not assume parity between employee benefit plans and insurance companies. Though pension plan terms may be negotiated only between unions and employers, group insurance policies must be negotiated with insurance companies. Moreover, where an insurance company is the fiduciary making claims decisions under its own group policy, the labor policy considerations are significantly different.[9] *Rehmar* does not require a result different from that reached here. Accordingly, plaintiffs' state claims are not preempted. *Accord Wadsworth,* 562 F.2d at 79.

### B.

### Adhesion Contract Analysis

Defendant next contends that even under California law, plaintiffs' policy is not an adhesion contract and therefore the court should not apply the California rules for construction of insurance contracts discussed above. In support of this proposition, defendant cites *Madden v. Kaiser Foundation Hospitals,* 17 Cal.3d 699, 131 Cal.Rptr. 882, 552 P.2d 1178 (1976). For several reasons, however, the court rejects defendant's contention.

First, defendant reads *Madden* too broadly. In *Madden,* the Board of Administration of the State Employees Retirement System ("the Board") negotiated a medical services contract with Kaiser Foundation Health Plan on behalf of state employees. The contract contained a provision requiring arbitration of all malpractice claims. Plaintiff, a state employee enrolled in the plan, sued in state court, claiming that the

arbitration provision could not be given effect. She argued that the medical services contract was an adhesion contract and that because she was unaware of the arbitration provision, she should not be bound by it.

In rejecting plaintiff's argument, the California Supreme Court found that the Kaiser plan was not an adhesion contract, and therefore held that the plaintiff's lack of awareness of the arbitration provision did not invalidate it. The court then explained the basis for its finding that the plan was not an adhesion contract. It stated that three factors present in many adhesion contracts were not present in the Kaiser plan. First, in all adhesion contract cases, the provision at issue is weighted in favor of the stronger party. In contrast, the arbitration provision, the court reasoned, did not burden the plaintiff more than Kaiser. In fact, it was beneficial to both of them. Second, while in adhesion contract cases generally the stronger party drafts the contract and the weaker party has no opportunity to negotiate its terms, the board had negotiated on behalf of the state employees and had parity of bargaining strength with Kaiser. Finally, though in many adhesion contract cases the weaker party must either adhere to the contract or forego the needed service, "[p]laintiff, on the other hand, enjoyed the opportunity to select from among several medical plans negotiated and offered by the board, some of which did not include arbitration provisions, or to contract individually for medical care." *Madden* at 711, 131 Cal.Rptr. 882, 552 P.2d 1178.

According to defendant, *Madden* stands for the proposition that unless an insurance policy is an adhesion contract un-

---

**9.** Even if the plaintiffs had brought this suit under § 301 or ERISA, the court strongly doubts that the arbitrary or capricious standard of review would apply. Though no court appears to have considered the question, it strains credulity to suggest, as defendant does here, that when an insurance company is the fiduciary making claims decisions under its group policy, that it is due the same deference accorded to trustees who have no financial interest in their decisions. There is an inherent conflict of interest between an insurance company's

duties to plan participants and to its policyholders. To remedy this conflict, California insurance law holds insurers to fiduciary standards by *inter alia* applying strict rules of construction against the insurer. Similarly, in order to enforce ERISA's fiduciary standards for claims denials, it may be appropriate, in whole or substantial part, to apply these rules when the ERISA fiduciary making the denial is an insurance company with a financial interest in the decision.

der *Madden's* three factors, the California rules for construing insurance contracts do not apply. However, defendant reads *Madden* too broadly. In large part, the decision is based on the California Supreme Court's strong preference for arbitration as an alternative dispute resolution technique. The court's opinion discusses at length the policy in favor of arbitration. *See also Beynon v. Garden Grove Medical Group,* 100 Cal. App.3d 698, 704, 161 Cal.Rptr. 146 (1980). Consequently, the court's opinion may not apply literally outside the arbitration context. Furthermore, the *Madden* court declined to follow the suggestion of an amicus that beneficiaries of a group health insurance policy are not bound by an arbitration provision absent proof of actual knowledge of the provision on the grounds that it would make orderly administration of the plan impossible. *Madden,* 17 Cal.3d at 709 n. 11, 131 Cal.Rptr. 882, 552 P.2d 1178. The impracticability which concerned the court, however, does not apply to the California rule that ambiguities in insurance contracts are construed against the insurer. Though it may create additional liabilities, continued application of this principle to group insurance contracts would not interfere with orderly administration. The court does not read *Madden* to hold that this rule of construction is inapplicable to group insurance contracts which are not traditional adhesion contracts. Moreover, the California Court of Appeals has expressly adopted this interpretation of *Madden.* In *Jones v. Crown Life Ins. Co.,* 86 Cal.App.3d 630, 150 Cal.Rptr. 375 (1978), the court held that the ambiguities rule applies to group insurance contracts regardless of whether the contracts are adhesive:

> Defendant contends that if the principles regarding the interpretation of adhesion contracts are not applied, plaintiff could not recover as a matter of law. Defendant states that if the general rules of construction of contracts are applied, the exclusionary clause in question would be interpreted against plaintiff, the insured.

> This is a misstatement of the law. Even if an insurance contract is not a contract of adhesion, any "ambiguity of (sic) uncertainty in the contract is to be resolved against the insurer." (*Schmidt v. Pacific Mut. Life Ins. Co., supra,* 268 Cal.App.2d 735, 738, 74 Cal.Rptr. 367, 369).

*Id.* 150 Cal.Rptr. at 379 n. 3.

A second ground for rejecting defendant's contention is that the instant case is distinguishable from *Madden* on its facts. In the *Jones* case, the court found that a group life and health insurance policy was not an adhesion contract because it did not meet all three of the *Madden* factors. The employer representative who negotiated the policy on behalf of the employees did not have equal bargaining strength with the insurance company and did not actually negotiate the terms of the policies. The employees did not have the opportunity to choose between several different plans; rather, they could either accept the standardized agreement or contract individually for insurance. Therefore, they had no realistic opportunity to look elsewhere for a more favorable contract. Finally, the exclusion clause at issue limited only the company's liabilities.

■ Though it falls somewhere between the two cases, the instant case is more similar to *Jones.* A crucial factor in *Madden* was that the arbitration clause was beneficial to both parties. In contrast, the clause at issue in this case, like that in *Jones,* limits only the liabilities of defendant. Moreover, at oral argument, counsel stated that TWA employees only were given a choice between two plans.[10] This is far from the *Madden* plaintiff's choice between several different plans, some of which did not contain the arbitration provision. The limited choice here does not provide a realistic opportunity to look elsewhere for a more favorable contract. Although there are no facts in the record from which the court can determine whether TWA and the

---

**10.** If the court's recollection is incorrect, the parties may bring this to the court's attention. However, in any event, the court's resolution would be the same since it relies on other grounds as well.

union had a parity of bargaining power with the defendant, the other two factors are sufficient to distinguish this case from *Madden*.[11]

## C.

### *Public Policy*

■ Defendant further argues that regardless of the general principles for insurance contract construction, the court must construe insurance policies in accordance with public policy. According to defendant, insurance companies are "quasi-public" institutions owing special obligations to the public. In particular, an insurer must interpret its obligations to avoid encouraging insureds to take actions which violate public policy. In the instant case, defendant urges, the relevant public policy is that expressed in the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*: to protect the public from unsafe and ineffective drugs. Moreover, just as courts must defer to the FDA's determination that a drug is not safe or effective, so too must an insurance company. According to defendant:

> [s]ound public policy dictates that insurance companies pay heed to determinations made by the FDA in this important area, rather than making independent decisions as to the efficacy of a particular drug. *Only* by acting in concert with the FDA will the public be protected from worthless, and possibly harmful drugs.

Consequently, defendant concludes, it is "bound to defer to FDA in determining what qualifies as 'covered expenses,' and that if therapy is not FDA-approved (like immuno-augmentative therapy), it is not, and should not be, covered regardless of whether it was 'legally' administered in a foreign country."

It is distressing to see how easily defendant clothes itself as a quasi-public institution with special obligations to the public when its view of public policy leads to a denial of liability. It is equally distressing to see how facilely it argues that it should not be bound by the public policy which protects policyholders from ambiguous policy limitations and exclusions. The simple answer to defendant's contentions is that it should have taken the public policy it urges this court to adopt into consideration when it drafted its contract. As the court in *Wilson v. Travelers Ins. Co.*, 605 P.2d 1327, 1329 (Okl.1980), stated, "[t]he contract could have precluded payment for illegal drugs, experimental drugs, or provided that all drugs must have been declared safe and effective by the FDA before they would be covered expenses under the contract. It did not do so." Placing the exclusion in the contract would have been particularly appropriate here because TWA employees travel throughout the world and are permitted to have international residences. Since these employees might receive treatments which are standard in another country, but which are not approved for any variety of reasons by the FDA, they may reasonably expect coverage for some non-FDA approved treatments absent a specific exclusion in defendant's policy. In the alternative, the company could have reserved the right to require pretreatment screening for experimental therapies or drugs. *See generally Foster v. Transit Casualty Co.*, 498 S.W.2d 293 (Mo.App.1973); *Provident Life & Acc. Ins. Co. v. Persons*, 396 So.2d 108 (Ala.Civ.App.1981). Though this court wholeheartedly agrees with many of defendant's policy arguments, in the instant case to interpret the policy language "essential to the necessary care and treatment" to mean "FDA approval" would nullify the overriding public policy protecting insureds from ambiguous policy limitations

---

**11.** A recent Court of Appeals case, *Beynon v. Garden Grove Medical Group*, 100 Cal.App.3d 698, 161 Cal.Rptr. 146 (1980), suggests that if the clause at issue limits the company's obligations or liabilities, this alone is sufficient to distinguish *Madden*. In *Beynon*, the contract required arbitration of malpractice claims and provided the defendants with the unilateral right to reject the arbitrator's decision and demand rearbitration. The court found that this provision was entirely in the defendant's favor and seemed to suggest that on this ground alone, adhesion contract principles apply. *Id.* at 705–06, 161 Cal.Rptr. 146.

and exclusions. The court finds that the California courts would not do so. Accordingly, the court declines to adopt defendant's analysis.

### D.

*The Invalidity of Defendant's Denial*

■ Citing *Yeng Sue Chow v. Levi Strauss & Co.,* 49 Cal.App.3d 315, 325, 122 Cal.Rptr. 816 (1975), defendant argues finally that under California law, in the absence of ambiguity, insurance contracts are enforced according to their terms. According to defendant, the coverage clause language, "essential to the necessary care and treatment," applies unambiguously to this case and means that non-FDA approved drugs are not covered.

■ Although defendant's statement of the law is correct, this court cannot agree that the policy language is unambiguous, at least in its application to the facts of this case. "Essential to the necessary care or treatment" provides no clear guidance as to when and under what circumstances the policy will cover experimental and unconventional treatments like immuno-augmentative therapy. Moreover, the wide variety of contrasting interpretations given similar language by the courts, at least some of which have found such language ambiguous, demonstrates that the policy language is ambiguous. *See, e.g., Fassio v. Montana Physicians' Service,* 170 Mont. 320, 553 P.2d 998 (Mont.1976) (suggesting that "necessary services" is ambiguous and finding that,

despite defendant's contention that the treatment was worthless and unacceptable medical practice, all the language requires is that the services be prescribed and performed by a licensed physician); *Van Vactor v. Blue Cross Ass'n,* 50 Ill.App.3d 709, 8 Ill.Dec. 400, 365 N.E.2d 638 (Ill.App.1977) (finding "medically necessary" ambiguous and interpreting it to require only that the services be prescribed in good faith by a physician); *Aetna Life Insurance Co. v. Sanders,* 127 Ga.App. 352, 193 S.E.2d 173 (Ga.App.1972) (finding the physician's recommendation entitled to great weight under the language "necessary to the treatment"); *Abernathy v. Prudential Insurance Co. of America,* 274 S.C. 388, 264 S.E.2d 836 (S.C.Sup.Ct.1980) (equating "necessary" with "appropriate"); *R.A. v. The Prudential Ins. Co. of America,* Docket No. L 8093–79 (Sup.Ct.N.J. August 6, 1982) (concluding that "reasonably necessary" does not cover treatments which are worthless)[12]; *Victum v. Martin,* 367 Mass. 404, 326 N.E.2d 12, 16 (Mass.1975) (necessary means "wise in the light of facts known at the time rendered"); and *Group Hospitalization, Inc. v. Levin,* 305 A.2d 248, 250 (D.C.App.1973) (necessary means "reasonably calculated to shorten and relieve an ordeal of agonizing pain and thereby effectuate the most rapid recovery possible").[13]

■ Moreover, even if the language is not ambiguous, defendant's interpretation is unreasonable. "Essential to the necessary care and treatment" cannot, *ipso facto,* be equated with non-FDA approval. De-

---

**12.** Defendant has cited two unpublished opinions in support of its claim that the policy is unambiguous. Although the court need not consider them, they are useful for illustrative purposes.

**13.** In *R.A. v. The Prudential Ins. Co. of America,* Docket No. L 8093–79 (Sup.Ct.N.J. August 6, 1982), though the court stated that the term "reasonably necessary" is unambiguous, this overstates the court's actual holding. In *R.A.,* the court found that as a factual matter laetrile is worthless in treating cancer. After discussing the widely varying interpretations of the term "necessary," the court noted that no case had held that coverage for "necessary" services includes worthless treatments. It therefore rejected plaintiffs' claims. *R.A.* only stands for

the proposition that "necessary" is unambiguous in its application to worthless treatments. This does not imply that it is unambiguous in other contexts.

In *Henne v. Mutual of Omaha,* No. 81–1359 (D.D.C. January 10, 1983), though the court stated that "necessary for the treatment of an injury" is unambiguous, it did not rely on this language in rejecting plaintiff's laetrile claim. In that case, the policy specifically excluded "services and supplies not prescribed by a doctor in accordance with generally accepted professional medical standards." The court held that this language unambiguously excluded plaintiff's claim. Consequently, *Henne* does not support defendant's case.

fendant has not cited a single court which has interpreted similar language in such a fashion. Furthermore, such an interpretation is not justified as a textual matter. "Necessary care" implies that the care is in some degree beneficial to the patient. The fact that FDA has not approved a treatment does not automatically mean that a treatment is worthless.

■ Though the court rejects defendant's interpretation of the policy, defendant now asserts several other defenses to this action. It argues that the Burton therapy is worthless and therefore not necessary to Mrs. McLaughlin's treatment; that Dr. Clement, the only licensed physician at the Immunology Researching Centre, did not actually prescribe the therapy; and that Mrs. McLaughlin's use of the therapy was illegal in California. The court, however, need not rule on these contentions because this case must be decided on other grounds. Though no California court has decided the issue, this court concludes that the California Supreme Court would hold that an insurance company which relies on specified grounds for denying a claim thereby waives the right to rely in subsequent litigation on any other grounds which a reasonable investigation would have uncovered. The basis for the court's conclusion is as follows.

In the leading case of *Egan v. Mutual of Omaha,* 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), the California Supreme Court ruled that the implied covenant of good faith and fair dealing requires an insurance company to investigate thoroughly its insured's claims. According to the court, to protect the insured's interests, "it is essential that an insurer fully inquire into possible bases that might support the insured's claim.... [A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Id.* at 819, 169 Cal.Rptr. 691, 620 P.2d 141. The court also noted the special fiduciary obligations an insurer owes its policyholders:

'The insurers' obligations are ... rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of services affected with a public interest must take the public's interest seriously, where necessary placing it before their interest in maximizing gains and limiting disbursements... [A]s a supplier of a public service rather than a manufactured product, the obligations of insurers go beyond meeting reasonable expectations of coverage. The obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary.'

*Id.* at 820, 169 Cal.Rptr. 691, 620 P.2d 141 (quoting Goodman & Seaton, *Forward: Ripe for Decision, Internal Workings and Current Concerns of the California Supreme Court,* 62 Cal.L.Rev. 309, 346–47 (1974)). If an insurance company could deny a claim without thoroughly investigating it and then defend a subsequent lawsuit on grounds which it develops during discovery for trial, the company's incentive to fulfill its duty to investigate would be significantly diminished.

■ A federal district court in a diversity action,

should not apply state law in an unduly narrow and mechanical manner. Rather, a federal court should consider carefully the underlying principles and policies embodied in the state precedents.

*Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 501 n. 13 (3d.Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978). Where the state's highest court has not provided definitive guidance on how to interpret a state law, the district court's construction of the law of the state in which he or she sits is entitled to substantial deference. *See Gaines v. Haughton,* 645 F.2d 761, 770 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982). The California Supreme Court has construed state insurance law quite strictly against insurers, especially in the area of the covenant of good faith and fair dealing. *See* 16A Appleman, Insurance Law and Practice, §§ 8877–8877.45, at 382–416 (1981). Given the strictness of its rulings, the strength of the insurer's

public obligations, and the important interests served by the duty to investigate, this court concludes that the California Supreme Court would hold that an insurer waives its right to rely on defenses not specified in its denial which a reasonable investigation would have uncovered.

 In the instant case, in denying plaintiffs' claim, defendant relied solely on the ground that the Burton therapy is not FDA-approved. Although initially it explained its denial by citing to the policy language, when plaintiffs' counsel requested clarification, defendant responded, "since our denial is limited to the immuno-augmentative cancer therapy which is not approved by the FDA or available in the United States as a prescription required service ... the exclusion of the expenses of the therapy is appropriate." The depositions of the responsible officials make crystal clear that Connecticut General relied solely upon the non-FDA approval.

Furthermore, defendant failed to make an adequate investigation of plaintiffs' claim. Clearly the duty to investigate possible bases for an insured's claim includes the duty to investigate grounds for denying the claim. Defendant, however, did neither. First, it never attempted to contact plaintiff's United States doctors even though Dr. Jacobs had written that she believed plaintiff may have benefitted from the therapy and Mrs. McLaughlin informed defendant that Dr. Schoen was impressed with her condition. Similarly, it did not even attempt to contact either doctors who believed Burton's therapy might be effica-cious or the Immunology Researching Centre itself. Consequently, it cannot now argue that the therapy is worthless. Second, any reasonable investigation would surely have uncovered the fact that California law makes use of the Burton therapy illegal and that Burton is not actually a physician. Simply reading the Researching Centre's literature would raise a suspicion about Burton's professional status.[14] Accordingly, because defendant inadequately investigated plaintiffs' claim and relied solely on an invalid basis for denying the claim, it cannot now raise other defenses.[15]

Finally, though the cases are deeply split, courts from other jurisdictions have adopted the same or similar rule. For an in depth discussion of the conflicting cases, see Appleman, Insurance Law and Practice, Volume 16C §§ 9260–61 (1981). For instance, in Stone v. Waters, 483 S.W.2d 639 (Mo.App.1972), the court held that where an insurer relies on a specified ground for denying liability, it may not thereafter deny liability on another ground if it had knowledge of the basis for that ground or a reasonable investigation would have revealed the basis. The court explained that the reason for the rule is that the insured will have incurred prejudice such as the expense of bringing suit and that good faith requires that the company inform the plaintiff fully of its position. Id. at 645–66.[16] Similarly, in Armstrong v. Hanover Insurance Co., 130 Vt. 182, 289 A.2d 669 (Vt.1972), the Vermont Supreme Court held that when an insurer specifies one reason for its denial all others are waived regard-

14. See plaintiffs' Exhibit B at 3–4. Plaintiffs supplied defendant with this brochure in early November 1980. A careful reading of the section on Burton's background would at least raise a suspicion that he is not a physician.

15. The cases cited by defendant are also distinguishable on this basis. In R.A., the insurance company did not reject plaintiff's laetrile claims on the grounds that laetrile is not FDA-approved. Rather, it denied the claims because it contended that laetrile is worthless in the treatment of cancer. After hearing a trial, the court agreed. Here, however, defendant did not deny plaintiffs' claim because immuno-augmentative therapy is worthless. Similarly, in

Henne, the insurance company relied on its exclusion of supplies not prescribed in accordance with generally accepted medical standards.

16. In its brief, defendant suggested that Missouri law might apply to this action because defendant issued the group policy to TWA in Missouri. At oral argument, however, both parties conceded that California law applies. To the extent that California law is unclear, however, the court looks to Missouri law to resolve this case. As noted in the text above, under Missouri law, defendant clearly waived its right to raise its newly asserted defenses.

less of whether the insured is misled or prejudiced thereby. In *Dillingham Corp. v. Employers Mutual Liab. Ins. Co. of Wisconsin,* 503 F.2d 1181, 1183 (9th Cir.1974), the Ninth Circuit interpreted Oregon law to adopt the same rule. Under these cases, defendant would clearly be barred from raising its new defenses, and as explained above, the court concludes that California would adopt this position. Moreover, even under the cases which require a showing of prejudice, defendant would still be barred. It waited until the day before trial to notice a motion for summary judgment in which it raised many of these issues for the first time. The expense to plaintiffs of bringing this lawsuit and prosecuting it up to trial is sufficient prejudice to bar defendant's contentions.

Accordingly, subject to confirmation of its subject matter jurisdiction, the court will grant summary judgment for plaintiffs on their breach of contract claim.

### IV.

#### The Covenant of Good Faith and Fair Dealing

Plaintiffs also move for summary judgment on their claim of breach of the implied covenant of good faith and fair dealing. Defendant opposes this motion on the ground that Mr. McLaughlin has no standing to sue for breach of the implied covenant under *Austero v. National Cas. Co.,* 62 Cal.App.3d 511, 133 Cal.Rptr. 107 (1976), because Mr. McLaughlin is not a party to Mrs. McLaughlin's insurance policy.

In *Austero,* Mr. Austero had procured disability and life insurance policies from defendant. Under the latter, Mrs. Austero was the beneficiary. Subsequently, he became disabled, but defendant refused to pay his claim. Mrs. Austero then sued for breach of the implied duty of good faith and fair dealing. In rejecting her cause of action for lack of standing, the court noted that though breach of the implied covenant sounds in tort, it arises out of an underlying contractual relationship. Because Mrs. Austero was not a party to the insurance contract, the court held she lacked standing.

However, the court limited the reach of its holding by stating, "an insurer's duty of good faith and fair dealing is owed solely to its insured and perhaps, any express beneficiary of the insurance policy... As to disability benefits, plaintiff is at most an incidental or remote beneficiary." *Austero,* 62 Cal.App.3d at 517, 133 Cal.Rptr. 107.

A more recent court of appeals case, *Delos v. Farmers Insurance Group,* 93 Cal. App.3d 642, 155 Cal.Rptr. 843 (1979), demonstrates the limits of the *Austero* holding. In *Delos,* Mr. and Mrs. Delos were insured under an automobile insurance policy issued by defendant. Mrs. Delos then suffered injuries in a car accident, and when the defendant denied their claim, both Mr. and Mrs. Delos sued, alleging breach of the implied covenant. Reasoning that both Mr. and Mrs. Delos were parties to the contract and that Mr. Delos' injuries were reasonably foreseeable from an improper denial by defendant, the court held that Mr. Delos had standing.

The instant case is much closer to *Delos* than to *Austero.* Both Mr. and Mrs. McLaughlin were parties to the insurance contract; he as the "employee" and she as his "dependent." Moreover, it was clearly foreseeable that defendant's wrongful denial of Mrs. McLaughlin's claim would cause Mr. McLaughlin emotional distress and other injuries. Indeed, facts here present an even more compelling case than *Delos* for finding standing. Defendant's group policy defines the relationship between employee and dependent as follows: "Any reference in this policy to a Dependent insured means a Dependent *for whom the Employee is insured.*" § 7, pg. 17 (emphasis supplied). Under the policy, then, Mr. McLaughlin is insured for any expenses incurred by Mrs. McLaughlin. Obviously this insurance policy provides coverage for employees' dependents in recognition of the potential adverse financial impact which medical expenses of an employee's spouse or dependent children can have on the employee. Consequently, if anyone has standing, it is Mr. McLaughlin. Finally, to the extent

that *Austero* and *Delos* are inconsistent, this court follows *Delos* both more recent and more consistent with the California Supreme Court's recent expansion of tort liability.

 The court also holds that defendant, as a matter of law, breached its good faith obligation in this case. The *Egan* case established that an insurer breaches the implied covenant when it fails to investigate thoroughly possible bases that might support an insured's claim. As previously discussed, defendant failed to contact plaintiff's United States doctors even though it was aware that they may have felt that the therapy was beneficial to plaintiff. It also failed to contact the Researching Centre or any physician who believes in the efficacy of the treatment for an explanation of the basis for that position. Moreover, even though defendant had paid Laetrile claims in the past despite its lack of FDA approval, as long as state law permitted the drug to be obtained only upon the prescription of a physician, defendant did not attempt to determine whether immuno-augmentative treatments are available in the Bahamas only upon the prescription of a licensed physician. Given the strength of the company's duty to investigate possible bases for its insureds' claims, as a matter of law defendant breached the implied covenant by failing to investigate the evidence supporting plaintiffs' claim.

 Defendant argues that its failure to investigate was justified in this case because it denied the claim solely on the grounds that the therapy is not FDA-approved. According to defendant, since no further investigation was needed under its interpretation of the contract, its decision not to investigate further was reasonable. There are two fallacies in defendant's argument. First, *Egan* requires it thoroughly to investigate possible bases which *might* support an insured's claim. Before relying on a single interpretation of the policy, which the evidence suggests was not strictly enforced, defendant should have gathered evidence supporting plaintiff's claim to determine whether to forego application of the

rule in this case. This is particularly so here where defendant's legal department informed it that its interpretation of the policy was at least questionable.

Second, defendant's interpretation of the contract was itself unreasonable, making its reliance on that interpretation unreasonable. Given the legal department memo and the well known principle that ambiguities in insurance contracts are interpreted against the insurer, defendant's position that its policy language somehow incorporated the strict requirement of FDA approval was unwarranted. Accordingly, subject to confirmation of its subject matter jurisdiction, the court shall grant plaintiffs summary judgment on their breach of the implied covenant claim.

## V.

### Punitive Damages

Defendant has moved for summary judgment on plaintiffs' punitive damages claim. Simply because plaintiffs have prevailed on their breach of implied covenant claim does not necessarily mean that they are entitled to punitive damages. In *Silberg v. California Life Insurance Co.*, 11 Cal.3d 452, 462, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974), the California Supreme Court stated:

[i]t does not follow that because plaintiff is entitled to compensatory damages that he is also entitled to exemplary damages. In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ.Code § 3294). He must act with the intent to vex, injure or annoy, or with conscious disregard of the plaintiff's rights. (citations). While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with a requisite intent to injure plaintiff.

 Plaintiffs have offered no evidence which suggests that defendant intended to injure them or that it consciously disregarded the fact that it had no basis for its denial and that its denial would injure plaintiffs. Though the evidence demonstrates that de-

fendant acted cavalierly in handling plaintiffs' claim, it had valid reasons for being disinclined to grant the claim. To allow punitive damages in this case would be to hold that every time an insurer acts unreasonably in denying a claim, its actions give rise to punitive damages. This is not a punitive damages case. Accordingly, plaintiff's punitive damages claims will be dismissed.

IT IS ORDERED that both parties shall submit affidavits regarding the citizenship of TWA within twenty (20) days from the date of this order. If the affidavits demonstrate that TWA is not a California citizen, the court will grant plaintiffs' summary judgment on their breach of contract and of the implied covenant of good faith and fair dealing claims, and grant defendant summary judgment on plaintiffs' punitive damages claims.