William D. RUFFIN et al., Appellants,

v.

COUNTY OF LOS ANGELES et al., Appellees.

Sherman A. JONES et al., Appellants,

v.

COUNTY OF LOS ANGELES et al., Appellees.

David L. ELLIS et al., Appellants,

v.

COUNTY OF LOS ANGELES et al., Appellees.

No. 77-2532.

United States Court of Appeals, Ninth Circuit.

Nov. 7, 1979.

John M. Sink, Santa Barbara, Cal., argued, for appellants.

Philip H. Hickok, Los Angeles, Cal., argued and on brief, for appellees.

Before CHAMBERS and ELY, Circuit Judges, and COPPLE,* District Judge.

ELY, Circuit Judge:

The appellants are 128 named corrections officers, all male, employed by the appellees, the Los Angeles County (California) Sheriff and the County of Los Angeles (hereinafter the "County"). They appeal the summary judgment dismissal of their employment discrimination claims against the County.

---

* The Honorable William P. Copple, United States District Judge, District of Arizona, sitting by designation.

Specifically, the corrections officers claimed that employment practices of the County violated both Title VII of the Equal Employment Opportunity Act (42 U.S.C. § 2000e) and the Equal Pay Act (29 U.S.C. § 206(d)) because female deputy sheriffs who are assigned to work in County detention facilities are compensated at a higher rate of pay than are corrections officers, all of whom are male. Male corrections officers, so appellants contend, perform tasks involving essentially equal skill, effort, and responsibility as those performed by female deputies who work in the same facilities.

We affirm.

## I.

The undisputed facts are as follows:

At the time the suit was instituted, the County employed more than 5,400 deputy sheriffs, and 591 of those were female. On the total number of deputy sheriffs, 1,001 were assigned to the Custody Division of the Sheriff's Department, the division responsible for operating the twelve detention facilities operated by the County.

Of the 1,001 deputy sheriffs assigned to the Custody Division, 768 were males and 233 were female. Virtually all deputy sheriffs received their first assignment to the Custody Division after completion of their law enforcement academy training. This policy of assigning new deputies to work in the detention facilities prior to becoming eligible for service in any of the other seven divisions of the Sheriff's Department, according to the County, enabled the deputies to gain skills in personal interaction in a controlled environment. The County did not regard the initial Custody Division assignment strictly as a training program, but rather as a condition precedent to eligibility for later assignment elsewhere in the Sheriff's Department. Some deputies, however, worked in the Custody Division for their entire careers with the Sheriff's Department.

It is not disputed that male and female deputy sheriffs performed essentially the same work while assigned to the Custody Division and received equal wages, benefits, and promotions. Likewise, it is undisputed that the various jobs performed by deputy sheriffs, both male and female, at the detention facilities were assigned on the basis of experience and rank. Moreover, the corrections officers have conceded that the County does not *presently* discriminate between male and female deputy sheriffs.

The position of corrections officer, held by all the appellants, is distinct from that of the position of deputy sheriff. Corrections officers were first hired in the early 1960s to fill an expressed need by the County for *man* power in the County's jails. The newly created position enabled the County to transfer male deputy sheriffs, who otherwise would not have been available for transfer outside the Custody Division, to other work stations within the Sheriff's Department, such as to field work and patrol duty assignments.

Before the inception of the corrections officer program, only deputy sheriffs supervised prisoners in County detention facilities. During the time the County was actively hiring corrections officers, female deputy sheriffs were assigned to work primarily in the detention facilities and generally were not assigned to field work and patrol duty. As the County explains, it never hired female corrections officers because, under its since-abandoned policy of not assigning female deputies to field work and patrol duty, employing additional females as corrections officers would not have allowed any female deputy sheriffs to transfer out of the Custody Division.

The County was able to attract a sufficient number of qualified applicants to fill the newly created corrections officer positions by relaxing the qualifications required for deputy sheriffs. For example, the upper age limit for deputy sheriff applicants, male and female, was 35 years, while that for corrections officer applicants was 53 years. Likewise, the physical requirements established for corrections officers were less rigorous than those demanded of deputy sheriffs, male or female. Moreover, even to be eligible to apply for a deputy sheriff

position, a candidate first must have had completed a basic law enforcement training program approved by the Commission on Peace Officers Standards and Training. No comparable minimum training or experience was required of corrections officer applicants.

During that period of time when the County predominately limited female deputy sheriffs to Custody Division duties, male corrections officers and female deputies were given substantially similar post-employment instruction in a Sheriff's Academy training program. Male deputies, who were eligible for later assignment to other divisions, received additional training appropriate to field work and patrol duty.

Prior to the inception of this suit, the County altered its policy, and female deputies no longer were limited to Custody Division assignments. Accordingly, the post employment training of female deputies was increased to the same level as that of male deputy sheriffs. In contrast, corrections officers continue to receive different training for a shorter period of time, and they are yet employed exclusively in the County's detention facilities.

In addition to the unequal job qualifications and the differing post-employment training received by the two classes of employees, other differences, significant in our consideration, between corrections officers and deputy sheriffs are (1) the availability of deputies for transfer out of the Custody Division to other work stations in the Sheriff's Department, (2) the potential for advancement enjoyed by deputies and not by corrections officers, and (3) the greater authority vested by the County in respect to deputies which extends beyond the jailhouse gates.

## II.

After reviewing the pleadings of the parties and the affidavits submitted in connection with the summary judgment motions, the District Court concluded that the appellants had failed to prove that the County discriminated against them on the basis of sex either in their employment or in their compensation. Among its Conclusions of Law, the District Court held that appellants, in order to prove their claims of sex discrimination, could not compare themselves to the sub-class of female deputy sheriffs. Rather, the District Court concluded that appellants should have been compared to the entire class of deputy sheriffs. It is these Conclusions of Law that appellants contend were erroneous.

Very briefly stated, the argument of the appellants is that their pleadings and affidavits raised genuine issues of fact as to whether female deputy sheriffs and corrections officers were a class of County employees separate and apart from male deputy sheriffs. Appellants claim that their showing of the many similarities of function between female deputies and corrections officers and of the fact that, in the past, the post-employment training given to female deputies more closely approximated the training given to corrections officers than that given to male deputy sheriffs established a *prima facie* case of sex discrimination under both Title VII and the Equal Pay Act. Thus, so appellants contend, the summary judgment against them should not stand.

■ We disagree. The appellants' contention wholly ignores many uncontroverted factual differences between the corrections officer and deputy sheriff positions, differences which defeat, as the District Court rightly concluded, the appellants' argument that female deputy sheriffs are "similar," for Title VII and Equal Pay Act purposes, to corrections officers.

■ In reaching our conclusion, we have not disregarded the fundamental proposition that, in reviewing the District Court's grant of summary judgment motion in favor of the County, all permissible inferences properly to be drawn from the record must be drawn in favor of the non-moving party. *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir. 1979); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978), *cert. denied*, 440 U.S. 981, 99 S.Ct. 1790, 60 L.Ed.2d 241 (1979); *Neely v.*

*St. Paul Fire and Marine Insurance Co.*, 584 F.2d 341, 343 (9th Cir. 1978).

Under Fed.R.Civ.P. 56(c), a summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If the movant satisfies his initial burden of demonstrating the absence of a genuine issue of fact, the burden then shifts to the opponent to come forward with *specific* facts showing that there remains a genuine factual issue for trial. Fed.R.Civ.P. 56(e). The evidence offered in opposition to the motion for summary judgment must be "significantly probative" as to any fact claimed to be disputed. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *British Airways Board v. Boeing Co.*, *supra*, 585 F.2d at 951; *Neely v. St. Paul Fire and Marine Insurance Co.*, *supra*, 584 F.2d at 344. "Where it is clear from the evidence presented at the hearing on a motion for summary judgment that the movant would be entitled to a directed verdict where the case to proceed to trial," summary judgment ordinarily should be granted. *Neely v. St. Paul Fire and Marine Insurance Co.*, *supra*, 584 F.2d at 344.

In attempting to paint a picture of conflicting evidence, appellants point to certain statements of one of their affiants, a fellow appellant named Skaggs, who claimed that corrections officers "routinely" pursued escapees outside detention facilities, "routinely" worked outside detention facilities in connection with riots in Los Angeles, and "routinely" investigated crimes occurring in the jails. These conclusory statements of Skaggs were offered in rebuttal to the County's factual demonstration that the responsibilities and duties of deputy sheriffs, male and female, exceeded those of corrections officers. We do not view Skaggs' affidavit as having satisfied appellants' burden of adducing specific facts rising to the level of "significantly probative" evidence (*see First National Bank of Arizona v. Cities Service Co.*, *supra*, 391 U.S. at 288–90, 88 S.Ct. 1575) necessary to counter the County's initial showing that the differential between corrections officers' and deputy sheriffs' wages was based on a factor other than sex. The County offered explicit evidence by way of affidavits and published job specifications detailing its employment policies. The fact that Skaggs, as he averred in his affidavit, may have "once" pursued escapees or "once" aided in riot control outside the County's detention facilities in no way contradicts the County's showing that corrections officers' authority was, as it always has been, limited to the County jail facilities or that the duties of the corrections officers were, as always, carried out under the direction and supervision of the Sheriff's sworn personnel.

In short, our review in the record compels us to the conclusion that, at most, appellants demonstrated only that the County at one time in the past treated male and female deputy sheriffs differently. Such "discrimination" took the form of a policy preventing female deputies from transferring to patrol duty and field work assignments. Possibly, female deputies *may* have been able to frame a cognizable claim under either Title VII of the Equal Pay Act based on the County's past policies.[1] Such a showing, however, does not

---

1. The Equal Employment Opportunity Act of 1972 (Pub.L.No. 92–261, 86 Stat. 103) (amending the Civil Rights Act of 1964), 42 U.S.C. § 2000e) extended the coverage of Title VII to units of state and local governments. Two years later, the Equal Pay Act (29 U.S.C. § 206(d)) was extended to apply to state and local governments by the Fair Labor Standards Amendments of 1974 (Pub.L.No. 93–259, 88 Stat. 55).

The record is unclear as to just when the County abandoned its employment policy of restricting female deputy sheriffs to other than patrol duty and field work assignments. Likewise, we do not find an indication in the record as to exactly when the County began its more intensive training program for female deputies. We do note that if the County's employment policies affecting its female deputy sheriffs were altered prior to the respective adoption

entitle appellants to bootstrap their job grievances with the County into an employment discrimination claim rooted in federal law. We hold simply that the County's past practices as to its female deputy sheriffs, however ill-conceived,[2] may not serve as a foundation for this suit brought under Title VII and the Equal Pay Act.

As Officer Skaggs' own statement attests:

> The difference [between the corrections officer and deputy sheriff position] was this: At all times involved in this action, women have been willing to do the work

required of a female deputy sheriff in return for the deputy sheriff's pay. *But men have not been equally willing to do this work for the same pay.* In fact the job description of "correction officer" was drawn up because of the simple fact that *men could not be hired in sufficient numbers to fill funded vacancies* in the Los Angeles County Sheriff's office. Money and hiring authority were available but they could not fill the jobs. Consequently the department took *some of the duties* normally assigned to deputy sheriffs and created a new job specification to do those duties. The duties in question were custodial, and the specification was cor-

---

dates of the two amendments, above specified, the female deputy sheriffs most probably could not have presented cognizable claims under the statutes. *See Hazlewood School Dist. v. United States,* 433 U.S. 299, 309, 97 S.Ct. 27, 36, 53 L.Ed.2d 768 (1977).

We also point out that appellants' claim is similarly limited by the respective adoption dates of the two amendments. Much of appellants' claim was centered upon the assertion that female deputy sheriffs were more like corrections officers than male deputy sheriffs because of the similarity of training given the female deputies and the corrections officers. But the appellants' written brief in our court indicates that this training discrepancy between male and female deputy sheriffs was discontinued in the early 1970s. Appellants' Opening Brief at 20. Quite possibly then, much of the so-called discriminatory practices seized upon by appellants as a foundation of their suit had been abandoned before either the Equal Pay Act or title VII became applicable to state and local governments.

2. The County has not attempted to defend the wisdom of its corrections officer program. In fact, the County has conceded that it is presently phasing out corrections officers, and it is now employing only deputy sheriffs. As the following colloquy, from the deposition of Assistant Sheriff Anthony, makes clear, the corrections officer position was never intended to be a career position within the Sheriff's Department:

> Q. Why is it that the Corrections Officer category is in effect a dead-end job in terms of promotion? I guess I should ask you first, is it a fair statement that the Corrections Officer is a dead-end job promotion-wise?
> A. Oh, yes, it is.
> Q. It has no rank structure?

> A. No. No career path was ever laid out for a Corrections Officer.
> Q. Was it originally conceived as a temporary function?
> A. I'm not sure what the original intent was at all except that it was a means to fill a need for some bodies, and they hired some. There wasn't a great deal of thought, unfortunately, that went into the Corrections Officer program. It was an easy way out of a situation, and they went that way, and there was never any—Nobody sat down and did any deep thinking about what happens when these people come with us for a while and they reach their maximum step of pay; where do they go on for challenges and things like that. That was just never really thought ought [sic]. It was an ill conceived program from the very beginning.

> \* \* \* \* \* \*

> It was a dead-end position when it was conceived. Unfortunately, Corrections Officers didn't realize this. Nobody gave it too much thought when they hired people. That's unfortunate.

The corrections officers negotiated with the County several times in an attempt to persuade the County to reclassify their positions to those of deputy sheriffs. The County rejected the suggestion. The appellants have conceded that "most of them [the corrections officers] could not qualify [for the deputy sheriff position] without a rule change (the upper age limit for deputies is 35 [years], for corrections officers, 53 [years])." Appellants' Opening Brief at 21. Their overtures for change having been rejected, the appellants then brought their suit claiming sex discrimination.

rection officer. They are paid less money for this job, and are still doing so. (Emphasis added.)

More than anything else, the foregoing statement supports that which the County has argued from the beginning, i. e., that the involved pay differential was not sex-based. Rather, the difference in pay between corrections officers and deputy sheriffs can best be explained on other grounds, such as job qualifications, which were relaxed in order to attract sufficient applicants to fill vacancies in the County's jails, and job responsibilities, which for deputy sheriffs, extend beyond mere custodial duties.

AFFIRMED.[3]

[3.] Because of the result we have reached, concluding that appellants did not adequately demonstrate discrimination against them because of their sex, it is unnecessary to reach the constitutional question raised of whether the Equal Pay Act permissibly may be extended to cover units of state and local government in light of *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). There, the Supreme Court held that the overtime and minimum wage provisions of the Fair Labor Standards Act (FLSA) could not be applied to state and local governments as an exercise of the federal power to regulate interstate commerce. The Court held that such an extension operated "to directly displace the States' freedom to structure integral operations in areas of traditional governmental functions," (*id.* at 852, 96 S.Ct. at 2474) and, as such, was not within Congress' authority under the Commerce Clause.

We do note, however, that the Courts of Appeals that have reached the constitutional question have considered *National League of Cities* to have decided only the limited issue raised by the extension of overtime and minimum wage standards to state governments. The trend has been to uphold the 1974 amendments as a legitimate exercise of congressional power, either under Section 5 of the Fourteenth Amendment (*see Marshall v. Owensboro-Daviess Cty. Hosp.*, 581 F.2d 116, 119–20 (6th Cir. 1978); *Usery v. Charleston Cty. School Dist.*, 558 F.2d 1169, 1170–72 (4th Cir. 1977); *Usery v. Allegheny Cty. Inst. Dist.*, 544 F.2d 148, 155–56 (3d Cir. 1976), *cert. denied*, 430 U.S. 946, 97 S.Ct. 1582, 51 L.Ed.2d 793 (1977)), or under the commerce clause (*see Pearce v. Wichita Cty., City of Wichita Falls, Texas, Hosp. Bd.*, 590 F.2d 128, 132 (5th Cir. 1979); *Marshall v. City of Sheboygan*, 577 F.2d 1, 6 (7th Cir. 1978)).