**Ron ZUMBRUN and Ann Zumbrun, Plaintiffs,**

**v.**

**UNITED SERVICES AUTOMOBILE ASSOCIATION, Defendant.**

**No. CIV. S–88–307 LKK.**

United States District Court, E.D. California.

Aug. 3, 1989.

Dennis M. Campos, Tracey S. Buck–Walsh, Diepenbrock, Wulff, Plant & Hannegan, Sacramento, Cal., for plaintiffs.

Otto F. Becker, Thornton, Taylor & Downs, San Francisco, Cal., for defendant.

## ORDER

KARLTON, Chief Judge.

This matter is before the court on plaintiffs' motion for partial summary judgment. For the reasons that I explain below, the motion is granted in part and denied in part.

## I

### CASE BACKGROUND

The Zumbruns, plaintiffs herein, own a home in Carmichael, California, which sits atop a cliff overlooking the American River. Defendant United States Automobile Association ("USAA") executed and delivered to plaintiffs a standard flood insurance policy pursuant to the National Flood Insurance Act, 42 U.S.C. § 4001, et seq., insuring the house.[1] In the Winter and Spring of 1986, heavy rains caused the American River to flood. Plaintiffs allege that these rains and the flooded river caused the bluff which supports their home to slide, causing serious damage to the home. On March 7, 1986, plaintiffs filed a claim with USAA under their flood insurance policy. Some 15 months later, USAA sent the Zumbruns' a written denial of

1. The regulations implementing the National Flood Insurance Act establish a so-called "write-your-own" ("WYO") program under which the administrator of the Federal Emergency Management Agency ("FEMA") may arrange for private companies to offer flood insurance coverage under the federal program. *See* 44 C.F.R. § 62.23.

their claim, which explained that denial of the claim was based on the conclusion of its engineer that "the failure of the slope near [their] home [was] not the result of a mud slide but is erosion." Plaintiffs' Exhibit 19. The letter continued: "Also, the erosion is a natural process and not of the type described in [the policy]." *Id.* The Zumbruns filed suit.

In their Second Amended Complaint, the Zumbruns assert a cause of action against USAA for breach of the insurance contract, and seek judgment for the sum of the policy amount plus consequential damages, interest, costs, and reasonable attorneys' fees. USAA filed its answer to the Zumbruns' complaint and asserted twenty (20) affirmative defenses. Many of these defenses are predicated upon policy exclusions which were not articulated in USAA's June 4, 1987 letter denying the Zumbruns' claim.

In the instant motion for partial summary judgment, the Zumbruns contend that USAA has waived its third through fifth, seventh through tenth, and thirteenth through twentieth affirmative defenses by failing to specify them as reasons for denying the claim in its June 4, 1987 letter. Plaintiffs also seek a determination that they suffered a covered loss under the insurance policy.

## II

### SUMMARY JUDGMENT STANDARDS UNDER FED.R.CIV.P. 56

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. at 1355 n. 11; *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. at 1592–93; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson*, 477 U.S. at 248–49, 106 S.Ct. at 2510–11; *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank*, 391 U.S. at 290, 88 S.Ct. at 1593; *T.W. Elec. Serv.*, 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller*, 368 U.S. at 468, 82 S.Ct. at 488–89; *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir.

1982). The evidence of the opposing party is to be believed, *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii*, 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd*, 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (citation omitted).

### III

### HAS DEFENDANT WAIVED VARIOUS AFFIRMATIVE DEFENSES?

Plaintiffs seek summary judgment on various affirmative defenses alleged for the first time by defendant in its Second Amended Answer. As I shall explain, I agree with plaintiffs that policy-based defenses must be raised at the time of denial or they are waived.

#### A. *Governing Law*

■ The first step in resolving any legal question is identification of the body of law governing resolution of the dispute.

The policy at issue was executed and delivered under the so-called "Write Your Own" ("WYO") program pursuant to the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4002, and its governing regulations, 44 C.F.R. pt. 62 (1988) (see n. 1, *infra*), and explicitly provides that it is

governed by federal common law. As I have previously noted, "recognizing that federal law must govern does not preclude the court from borrowing state law as a rule of decision in appropriate cases." *Federal Deposit Ins. Corp. v. Main Hurdman*, 655 F.Supp. 259, 265 (E.D.Cal.1987). The question of whether federal or state law should provide the rule of decision in cases like that at bar appears to be a matter of first impression.

In determining the source of the rule of decision, the predominant consideration must be congressional intent. *Id.* at 265, *quoting Mardan Corp. v. C.G.C. Music, Ltd.*, 804 F.2d 1454, 1458 (9th Cir.1986). Absent an expression of congressional intent, the court must determine "whether formulating a uniform federal rule would be appropriate as a matter of judicial policy." *Id.* The Ninth Circuit appears to follow two separate, although related, approaches for resolving whether state or federal law will supply the rule of decision in actions governed by federal common law. In *Mardan Corp.*, the court adopted the three-prong test enunciated in *United States v. Kimbell Foods*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), which requires the court to determine "(1) whether the issue requires a national uniform body of law; (2) whether application of state law would frustrate specific objectives of federal programs, and (3) whether application of a federal rule would disrupt commercial relationships predicated on state law." *Mardan Corp.*, 804 F.2d at 1458. In *State of Cal. ex rel. State Lands Comm'n v. United States*, 805 F.2d 857 (9th Cir.), *cert. den.*, —— U.S. ——, 108 S.Ct. 70, 98 L.Ed.2d 34 (1987), the circuit suggested in dicta that "courts must balance the federal and state interests in application of their own rules to the issue at

hand and, where the balance favors doing so, borrow state law as the rule of decision." *Id.* at 861. Whichever test is applied, it is my conclusion that state law ought to provide the rule of decision which governs private insurers' conduct in handling claims under insurance policies issued pursuant to the National Flood Insurance Act.

I begin by acknowledging that certain aspects of the Write–Your–Own program, such as the interpretation of substantive provisions of the contract may, but do not necessarily, require a uniform body of federal law.[2] On the other hand, there is no apparent reason that the rules regulating the procedural aspects of the relationship between a participating private insurer and its insured require such a uniform national rule. In this connection, it is important to remember that the occasions for the creation of an independent body of federal common law are said to be rare. *Texas Industries v. Radcliff Materials*, 451 U.S. 630, 641, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981).

It appears to this court that no federal purpose would be defeated by the adoption of state law as the rule of decision in cases involving the handling of claims. Indeed, the regulations explicitly provide that WYO companies are not agents of the federal government for any purpose and are "solely responsible for [their] insureds" under flood policies issued pursuant to the Act. 44 C.F.R. pt. 62, app. A, art. XVI (1988). Application of state law governing the relationship between insurers and their insureds would not significantly affect the substantive provisions of the standard flood insurance contract nor related aspects of the program, such as the federally-mandated rate structure and premium levels.[3] Indeed, where, as in California, state

---

**2.** I discuss this issue at length in section IV–B, *infra*.

**3.** It is true that a state's law affecting the scope of damages relative to the handling of claims may make participation in the program more expensive, thus indirectly affecting either the rate structure or the willingness of private insurers to participate in the program. Thus, allowing tort damages for mishandling of the

claims might arguably affect federal interests. Such an effect would appear to be sufficiently remote as not to require application of a federal standard. In any event, it is recognized that federal courts ought to reject specific state rules that are "aberrant or hostile to federal interests." *Mardan Corp.*, 804 F.2d at 1458. While these considerations may bear upon questions of the availability of punitive damages and the like, those questions are for another day; here

law has evolved rigorous and well-defined standards of conduct regulating insurers operating within their borders, one federal goal, the achieving of an efficient national flood insurance program would appear well-served by adherence to those standards.

Moreover, application of a newly-created federal rule governing the conduct of insurers relative to claims threatens disruption of settled expectations predicated on state law. It is true that participation in the WYO program is conditioned on compliance with the Act and its governing regulations. 44 C.F.R. pt. 62, app. A, art. IIB (1988). Nonetheless, private insurers who participate do so in the ordinary course of their commercial endeavors, and in the context of a well-defined body of state law governing their obligations to purchasers of insurance. Creation of a federal rule governing the relationship between insurers and their insureds might well create uncertainty and confusion in this area where the states have a strong and legitimate interest in application of their own laws.

Finally, the regulations governing WYO's may be read as suggesting that conventional, i.e., state standards, apply. For example, although the regulations note that claims adjustment practices are to be "guided by NFIP Claims manuals," 44 C.F.R. § 62.23(i)(1) they also provide that "WYO companies will adjust claims in accordance with general Company standards," *id.*, and that "the responsibility of defending claims will be upon the Write–Your–Own Company." 44 C.F.R. § 62.23(i)(6). Clearly, both the companies' adjustment standards and their methods for defense of litigation have evolved in response to state law.

■ For the reasons explained above, I conclude that state law may and should provide the federal rule of decision concerning when an insurer waives the right to advance particular defenses to an in-

sured's claim. I now turn to an examination of the California rule.

**B.** *The Waiver Doctrine Under California Law*

■ Ironically, although no California court has ruled on whether a failure to specify a reason for denying a claim constitutes a waiver, three other federal district judges applying state law have resolved the question. Each district court that has considered the issue has predicted that the California Supreme Court will hold that an "insurer waives its right to rely on defenses not specified in its denial of a claim which a reasonable investigation would have uncovered." *McLaughlin v. Connecticut General Life Ins. Co.*, 565 F.Supp. 434, 451 (N.D.Cal.1983); *Intel Corp. v. Hartford Acc. and Indem. Co.*, 692 F.Supp. 1171, 1178 (N.D.Cal.1988); *Becker v. State Farm Fire and Cas. Co.*, 664 F.Supp. 460, 461 (N.D.Cal.1987).[4]

In the leading case of *McLaughlin*, Judge Patel reasoned that the California Supreme Court's prior decision in *Egan v. Mutual of Omaha Ins. Co.*, 24 Cal.3d 809, 169 Cal.Rptr. 691, 620 P.2d 141 (1979), *appeal dismissed and cert. denied*, 445 U.S. 912, 100 S.Ct. 1271, 63 L.Ed.2d 597 (1980), and the trend in California to construe insurance laws strictly against insurers compelled adoption of this rule.

I am persuaded not only by the fact that every district court that has considered the matter has reached the same conclusion, but also by the reasoning that underlies that conclusion. In *Egan*, the California Supreme Court explained that for an "insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it must give at least as much consideration to the latter's interests as its own." 24 Cal.3d at 818–19, 169 Cal.Rptr. 691, 620 P.2d 141. Accordingly, the Court explained, "an insurer cannot reasonably and in good faith deny pay-

---

the question is, which law should govern the handling of claims?

**4.** It appears that more than 20 jurisdictions have also adopted this waiver rule, *see Intel Corp. v.*

*Hartford Acc. and Indem. Co.*, 692 F.Supp. 1171, 1178 (N.D.Cal.1988), *citing* 16 C. Appleman, *Insurance Law and Practice*, § 9260 at 393 (West 1981 and Supp.1987).

ments to its insured without thoroughly investigating the foundation for its denial." *Id.* The holding in *Egan* remains unimpaired. *See Frommoethelydo v. Fire Ins. Exchange*, 42 Cal.3d 208, 215, 228 Cal.Rptr. 160, 721 P.2d 41 (1986); *Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 684, 254 Cal.Rptr. 211, 765 P.2d 373 (1988).

It is true that the *Egan* holding could be construed to mean that the insurer's duty to investigate ends where *a* basis for denying an insured's claim is discovered. Such a narrow construction of *Egan*, however, would undermine the policies underlying the decision. As Judge Patel explained in *McLaughlin*,

> If an insurance company could deny a claim without thoroughly investigating it and then defend a subsequent lawsuit on grounds which it develops during discovery for trial, the insurer's incentive to fulfill its duty to investigate would be significantly diminished.

565 F.Supp. at 451. Rather, as was concluded in *McLaughlin*, "the duty to investigate possible bases for an insured's claim includes the duty to investigate grounds for denying the claim." *Id.* at 452. *See also Intel Corp.*, 692 F.Supp. at 1178 ("A natural concomitant of the *Egan* holding is that an insurer has a duty of candor to explain or at least make reference to the bases for denial of policy coverage").

I join the unbroken line of authority and conclude that application of the principles informing *Egan* and its progeny leads inevitably to the waiver rule urged by plaintiffs. Having established that an insurer's failure to notify its insured of the basis for denying a claim breaches the covenant of good faith, it would be anomalous to allow an insurer to assert previously unarticulated policy-based defenses to liability in subsequent litigation. To permit this result would in effect reward an insurer who has breached the covenant of good faith and fair dealing by failing to adequately investigate a claim before rejecting it by providing it with a defense which, had it timely performed its duty, would have precluded the litigation in the first place. Such a result would also encourage a dere-

liction of duty premised on a balancing of the cost of an appropriate investigation against the risk of being held liable for delay, especially in light of the likelihood that not all wrongfully denied claimants will sue. Surely such a construction cannot prevail in light of California's strict policy relative to the good faith obligations of insurers.

USAA argues that the waiver rule advanced by plaintiffs is incompatible with the holding of *Conner v. Union Automobile Ins. Co.*, 122 Cal.App. 105, 9 P.2d 863 (1932). I do not agree. *Conner* and its progeny stand only for the proposition that an insurer will not be estopped from denying liability under an insurance policy by post-loss conduct which is inconsistent with the unambiguous and undisputed terms of the policy. Here, USAA seeks to defeat coverage on the basis of policy exclusions which may or may not apply, but which it failed to investigate before denying plaintiffs' claim. The waiver rule articulated in *McLaughlin* does not have the effect of expanding coverage to include risks which the parties agree were not covered by the policy, as USAA suggests. Rather, this rule denies USAA multiple opportunities to avoid liability under terms of the policy that are ambiguous or disputed.

Under this analysis, plaintiffs are entitled to summary judgment on USAA's fourth, seventh, ninth, thirteenth, fifteenth, sixteenth, seventeenth and twentieth affirmative defenses. Each of these defenses allege policy-based reasons why liability for coverage should be denied which, if they apply at all, could have been discovered through reasonable investigation. The same cannot be said of the remaining defenses on which plaintiffs seek summary judgment.

USAA's third affirmative defense asserts that plaintiffs failed to file the current lawsuit in a timely manner. This defense relates to the conduct of this litigation and not the validity of the claim. Thus, the *McLaughlin* rule does not apply to it. *See Becker v. State Farm Fire and Cas. Co.*, 664 F.Supp. 460, 461 (N.D.Cal. 1987). Similarly, defendant's tenth affirm-

ative defense attacks the sufficiency of plaintiffs' complaint. For the same reason, it could not have been waived.

██ USAA's fifth affirmative defense relies on a provision of the policy which exempts damage caused by "gradual erosion" from coverage. This defense is fairly encompassed by the reasons stated by USAA for denying the claim in its June 4, 1987 letter, and for this reason is not waived. Finally, USAA's eighth, eighteenth and nineteenth affirmative defenses rely on policy provisions which seek to limit the amount of insurance benefits once a claim is found to be valid. Since, in this case, USAA denied the claim outright, it had no occasion to assert these defenses initially. Thus, as to all of these defenses, plaintiffs' motion for summary judgment is denied.

## IV

### HAVE THE ZUMBRUNS SUFFERED A COVERED LOSS?

Plaintiffs also seek a declaration that the policy covers losses of the type suffered by them, and further a ruling that they in fact suffered a covered loss.

#### A. *Governing Law*

██ As noted above, the insurance contract at issue in this case is a standard flood insurance policy issued pursuant to the Flood Disaster Protection Act of 1973, 42 U.S.C. § 4002 and its governing regulations, 44 C.F.R. pt. 62. In *Brazil v. Giuffrida,* 763 F.2d 1072 (9th Cir.1985), the Ninth Circuit, following several other courts, held that the interpretation of the provisions of standard flood insurance policies issued by the Federal Emergency Management Agency ("FEMA") itself were governed by a uniform national rule rather than the "statutory [or] decisional law of any particular state." *Id.* at 1075. Whether the same rule ought to apply to WYO companies is an open question in this cir-

cuit. Nonetheless, as I now explain, it is my view that a uniform federal rule must supply the rule of decision as to questions relating to the proper interpretation of the provisions of the policy.

The rationale supporting the conclusion that a national rule for the interpretation of the provisions of an insurance policy issued pursuant to the Act does not require a detailed application of the criteria enunciated in *Mardan Corp., supra;* rather, application of federal standards in this regard is almost compelled by the source of those provisions. The policy provisions are the product of federal regulations which require WYO companies to issue coverage "under the Standard Flood Insurance Policy." 44 C.F.R. § 62.23(c). As I noted above, those very same policy provisions, when appearing in policies issued by FEMA, are interpreted under a uniform federal common law standard. It would seem quite anomalous that the very same words appearing in separate policies, but both compelled by federal regulations would be interpreted under different bodies of law.[5] Accordingly, I find that a uniform national rule should supply the rule of decision in cases involving the interpretation of the provisions of insurance policies issued by WYO companies.

#### B. *Application of Federal Law*

Federal law provides that interpretation of an insurance policy is a question of law. *Sodowski v. National Flood Ins. Program,* 834 F.2d 653, 655 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 619 (1988). Accordingly, it is a question for the court, and I now turn to that task.

The contractual language defines "flood" as follows:

"Flood": Wherever in this policy the term "flood" occurs, it shall be held to mean:

5. It is perfectly true that identical insurance policies drafted and issued by national insurance companies are interpreted in potentially varying ways by differing state courts; that re-

sult, however, is a product of our federal system, and thus would not seem to be a persuasive argument for disparate treatment under the quite different circumstances of this case.

A. A general and temporary condition of partial or complete inundation of normally dry land areas from:

1. The overflow of inland or tidal waters.

2. The unusual and rapid accumulation or runoff of surface waters from any source.

3. Mudslides (i.e., mudflows) which are proximately caused by flooding as defined in subparagraph A–2 above and are akin to a river of liquid and flowing mud on the surfaces of normally dry land areas, including your premises, as when earth is carried by a current of water and deposited along the path of the current.

B. The collapse or subsidence of land along the shore of a lake or other body of water as a result of erosion or undermining caused by waves or currents of water exceeding the cyclical levels which result in flooding as defined in A–1 above.

Plaintiffs' Exhibit 20 (Insurance Policy) at 2.

It is undisputed that the flood conditions that plaintiffs contend caused damage to their home occurred on adjacent property. Plaintiffs argue that the policy definition of "flood" contemplates coverage where the insured property is damaged by soil movement caused by flooding of areas adjacent to the insured's property. USAA counters that the policy only provides coverage for damage caused by flood conditions which actually occur on the insured's property.

 The language of paragraph A of the policy is ambiguous regarding whether the "flood" must occur on the insured's property before coverage will attach. Paragraph A–1 refers to "the inundation of dry land areas" generally, while paragraph A–3,

which defines those mudslides that will be treated as "floods" under the policy, refers to liquid and flowing mud "including on your premises." The language of paragraph B, under which plaintiffs' claim arises, is also susceptible to alternative interpretations. One reading of the language suggests that coverage is available where a body of water rises to flood levels and erodes land supporting a house or covered structure, causing subsidence. An alternative reading suggests that coverage is available where a body of water rises to flood levels and causes erosion of land resulting in an overflow of inland or tidal waters.

 Because it does not appear that there is any case law interpreting this policy language, I turn to standard canons of contract construction. Under standard insurance principles, "if the language of the policy is clear and unambiguous, it should be accorded its natural meaning." *Sodowski*, 834 F.2d at 655, *quoting Hanover Bldg. Materials, Inc. v. Guiffrida*, 748 F.2d 1011, 1013 (5th Cir.1984). If, on the other hand, the language is reasonably open to two constructions, that more favorable to the insured is to be adopted. *Id.*, *quoting Aschenbrenner v. United States Fid. & G. Co.*, 292 U.S. 80, 54 S.Ct. 590, 78 L.Ed. 1137 (1934) (exposition of insurance principles relevant to interpretation of standard flood insurance policy).[6] Under these principles, the policy must be construed against the insurance company.

A second and perhaps even more persuasive reason to find in favor of plaintiffs on this issue exists. I have noted that the language in question is compelled by the regulations drafted by FEMA. It appears that FEMA, to whom the plaintiffs' claim was referred by USAA for a determination

---

**6.** This principle ordinarily rests upon the notion that the insurer is the drafter of the language and thus should suffer the consequences of ambiguity. Clearly, that rationale has significantly less force in these circumstances, where the language is the result of federal regulation. Nonetheless, I believe the principle has application here. As with all insurance policies, the terms are not subject to negotiation between the insured and the insurer, and the insured must take the policy as it is. Put another way, if the insured wants the peace of mind that insurance

provides, he or she must take it on the terms offered, or be without. While it is true that in the instant matter the insurer must also take the language as it is, for that party the issue is not one of peace of mind, but is one of profit. If the insurer determines that the profit to be made is worth the risk of ambiguity it becomes a WYO company; if in its commercial judgment the risk is not worth the profit, it does not. Under such circumstances, it appears to the court that application of the standard ambiguity rule of insurance construction is appropriate.

of coverage, has adopted the plaintiffs' interpretation of the policy language.[7] While not conclusive, the agency's construction of the policy is significant evidence of the proper interpretation. *See Diaz v. I.N.S.,* 648 F.Supp. 638, 644 (E.D.Cal.1986) ("an agency's interpretation of its own regulations is entitled to deference").

Given the rules for construction of ambiguous insurance clauses and the issuing agency's interpretation, the Zumbruns appear to be entitled to a ruling that their interpretation of the contractual language controls. They have not succeeded, however, in demonstrating as a matter of law that they suffered a covered loss under that interpretation.

In support of their contention that their loss was caused by subsidence of the bluff, plaintiffs rely on a portion of the report prepared by USAA's engineer which opined that the slope failures were caused by "scouring and undermining by river currents that develop near flood stage and wind-driven rainfall directed upon weak points along the face of the bluff." Plaintiffs' Exhibit 12 (letter from Paul Weidig to USAA re Zumbrun Residence, dated 1/13/87). In the paragraph that follows, however, Mr. Weidig continued:

> We have also reviewed the materials you sent us regarding flood disaster protection to determine whether the cause of the observed damage falls within insurable hazards outlined in that documentation. It is our opinion that the slope failure is not a mudslide, but that it is a form of erosion. The FEMA and FIA information you sent us, however, does not specifically treat erosion due to landsliding.

This opinion is hardly a model of clarity, and it is therefore unclear whether Mr. Weidig misinterpreted the FEMA/FIA standards for determining when a "mud-

slide" constitutes a flood within the meaning of the policy, or whether it is his conclusion that the "slope failures" on the cliff supporting the Zumbrun home were caused by erosion of a type not covered by the policy. The ambiguity in this evidence, without more, raises a triable issue of fact to be resolved by a jury. Accordingly, plaintiffs have not carried their burden of demonstrating entitlement to judgment as a matter of law.

## V

## CONCLUSION

For the reasons discussed above, plaintiffs' motion for partial summary judgment is GRANTED with respect to USAA's fourth, seventh, ninth, thirteenth, sixteenth, seventeenth and twentieth affirmative defenses, as well as their interpretation of the policy language. In all other respects, the motion is DENIED.

IT IS SO ORDERED.

---

7. In a letter dated November 8, 1986, regarding the Zumbruns' claim, Kirk Miller, Senior Claims Administrator for FEMA, wrote: "The engineer must determine if the slope failure was caused by the action of the American River eroding the lower part of the bluff on which the insured structure sits or whether the heavy rain simply saturated the ground on which the structure sits, causing the house to settle. The first

instance named above is a covered loss, the second is not.... It appears that the date of this loss is somewhat after the date of the Spring flooding in California. If, however, the American River did rise above it's [sic] normal cyclical level and erode the bank supporting the insured's house, ... there would be a covered loss." Plaintiffs' Exhibit 11.